UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.: 22-cr-10238-NMG |
| | ) | |
| KIM DALEY | ) | |

**SENTENCING MEMORANDUM ON BEHALF OF**
**KIM DALEY**

I.    **Introduction**

Kim Daley comes before the Court for sentencing following his plea to Bank Robbery and Escape. As a legal judgment, Mr. Daley is a career offender. But critically, the conviction which makes him so involved no more than *one tenth of one gram* of heroin[1]. Moreover, the conduct resulting in that conviction dates to more than two decades ago. And Mr. Daley's plea in that conviction occurred after an unreasonable delay in his arraignment and involved him accepting a sentence which was consumed by a different state prison term he was already serving. The harsh advisory guideline produced by the Career Offender designation in this case – 151-188 months – is excessive and sentence should instead be imposed with reference via departure or variance to the otherwise applicable guideline. That guideline range – 63-78 months based upon a Total Offense Level of 19 and Criminal History Category VI – encompasses all the acts committed by Mr. Daley, including commission of this bank robbery after walking away from Coolidge House.

---

[1] As explained below, the confirmed weight was actually 0.0136 grams (just over one one-hundredth of a gram) of heroin. The Hinton lab tested the contents of one bag with each bag being "similar items".

It is the second time Mr. Daley comes before the Court for sentencing and ordinarily it might be expected that a higher sentence than Mr. Daley previously received should be imposed. But although still serious, Mr. Daley's conduct here yields an otherwise applicable guideline range substantially lower than when he last appeared before the Court.[2] Against this backdrop, it is appropriate to impose a sentence which is lower than that he received previously.

The circumstances of Mr. Daley's current conduct are informed by a shortfall in bureaucratic functioning and a twist of fate. While serving his prior sentence from this Court (and as he explained to the Court at his last sentencing) he expected to participate in RDAP along with a plan to rid himself of the influences of Boston and instead reside in Texas with his father's widow whom he knew, Ms. Douglas. But for reasons that are not immediately clear, Mr. Daley was never  assigned to RDAP. And as he prepared for release, Ms. Douglas refused to let him stay with her because she had begun a relationship with a new boyfriend. With no other connection outside of Boston, and no other home to return to, he released to a bed at the Coolidge House without the necessary benefit of RDAP. Soon after his release from BOP in February 2022, he succumbed to relapse in his familiar surroundings of Boston. Not long afterwards, he walked away from Coolidge House and ultimately committed the bank robbery in this case via a note which did not contain a threat. Just 4'9" tall, his appearance was distinctive. Cambridge Police officers found Mr. Daley that afternoon within the hour and arrested him.

---

[2] The advisory guideline range in Mr. Daley's previous case before the Court was 100-125 months based upon a Total Offense Level of 24 and Criminal History Category VI.

While in pretrial custody, Mr. Daley sought and received an evaluation for participation in a medication assisted treatment (MAT) program and now receives methadone. During his last sentencing, Mr. Daley expressed his sense of having no one supporting him. During this pretrial detention, he reached out and has now spent time reconnecting with his sister, slowly earning her trust. She now allows him telephone contact with his nephews where once she did not. As he did previously, he expresses his fervent desire to receive treatment while in the Bureau of Prisons (BOP) which when taken in combination with continued MAT participation and renewed pro-social support can enable successful reentry after service of this period of incarceration.

After consideration of all of the facts and circumstances presented by Mr. Daley's case and history, it is respectfully requested that the Court impose a sentence of 78 months of incarceration (the top of the otherwise applicable guideline) to be followed by 3 years of supervised release on terms and conditions suggested in the Presentence Report as well as a special condition requiring Mr. Daley to participate in a MAT program during his supervision. The Judgement should come with the strongest possible judicial recommendation that Mr. Daley's MAT be continued while in BOP custody, that he be permitted to enter RDAP, and that he be considered for any reentry programming available both in the BOP and through the Federal District Court to which Mr. Daley resides upon his release. Such sentence is sufficient, but not greater than necessary here.

## II.    Offense Conduct

Shortly before 4:30 PM on June 20, 2022, Kim Daley walked into a TD Bank in Cambridge wearing a backpack. He approached a teller station and video surveillance shows only Mr. Daley's head and the top of his shoulders as visible over the counter. He

showed the teller a note, and they spoke briefly before the teller opened her cash drawer and removed two bundles. Mr. Daley examined them and put one bundle in his pocket. He then pulled apart a second bundle which contained a GPS tracker. As he pulled it apart looking for cash, he tossed the remnants over the counter.



Mr. Daley walked out of the bank and the teller noted to other employees that he had just robbed her. At least one employee followed Mr. Daley into the street and recorded him walking away. Approximately 40 minutes later, an off-duty Cambridge officer observed Mr. Daley on the street near a Walgreens. Other officers responded and they took Mr. Daley into custody inside the Walgreens without incident. He still had the $560.00 missing from the teller drawer.

### III.    Background of Mr. Daley

Mr. Daley's parents were 16 and 17 years-old when he was born prematurely. His mother used drugs during her pregnancy and never became a caretaker during his childhood. His father came around more, but lived his life in the streets of Boston rather

4

than at home. That left Mr. Daley's childhood to his great-grandmother and grandmother, with whom he resided after approximately 4-years of foster care placement during his infancy. Of his childhood, Mr. Daley says, "We grew up rough." He describes that he "used to get beatings that now you would call child abuse, back then it was just 'I'm gettin' beat.'" His mother lived down the street when he was growing up, but he almost never saw her and always struggled to understand why. With his grandmothers, he grew up in poverty that set him on a lifetime of struggle.

Mr. Daley described his great-grandmother's house as "wide open". There were frequent gatherings that included drinking and drug use. In addition to the physical abuse he experienced from his father, he endured prolonged additional abuse for three years by a family friend, starting when he was approximately 8 years old. *See* PSR ¶90. He never told anyone about the abuse, feeling a deep sense of shame and misplaced sense of responsibility for it. When he did tell his family later in life, the response was to tell him it happened a long time ago, and he should not go back on it, just move forward. He felt their reaction was to just sweep it under the rug, "like it just didn't matter". For his part, Mr. Daley describes, "I was ashamed. I thought it was my fault."

As an adolescent and teen, his family didn't impose a curfew, and even from before he was a teenager he could come and go as he pleased. He would sneak out of the house and not return until the early morning hours, spending his time in the streets. No one expressed concern for his whereabouts or cared what he was doing, as long as he eventually came home. With little guidance and no doubt wanting to get distance from his environment, he was introduced to drugs.

Following the death of his great-grandmother on September 6, 1987, he experienced his first time living on the street. After her death, Mr. Daley stayed with Pamela Morris, the mother of one of his half-brothers. That period was short-lived. She kicked him out a few months later and he "had to fend for myself." He describes, "I was on the street, here and there. I felt alone, like I had no one to turn to. So I tried to escape through drug use." Mr. Daley's misuse of substances began early, and he acknowledges it was normal in his environment, and made him "free of pain. I didn't have to worry about being beat or [mistreated]."

Predictably, Mr. Daley's life descended into successive sentences for different criminal episodes – all of which were informed by his substance use disorder. He committed break-ins and thefts as he emerged into adulthood and as an adult to support himself and his habit. Child-like standing just 4'9", he was able to easily sneak into the windows of businesses or residences, sometimes with the assistance of someone else, and take items that could be sold for cash. At age 21, he committed an armed robbery at a store and was placed on probation for 5 years. A little over half-way through that term, he was convicted of a breaking and entering, receiving concurrent state prison sentences where he served approximately 6 years before his release.

He would return to state prison in 2005 after separate convictions for breaking and entering and being observed by drug officers exchanging a small amount of heroin with a motorist (the circumstances of which are discussed more fully below).

In 2015, Mr. Daley committed three separate bank robberies using a note which demanded money and said that he had a gun. He received a 100 month prison sentence from this court, the low-end of the applicable advisory guideline.

In his appearance before the Court for his prior sentencing, Mr. Daley expressed recognizing the need for him to be away from Boston, outside of his old influences and his plan to release to Wendy Douglas, his father's widow[3] whom he had known since the late 1980's. The Court included a recommendation that he be permitted to participate in RDAP to address his clearly demonstrated lifetime substance use disorder. Mr. Daley served that sentence at USP Beaumont, FCI Three Rivers, and Beaumont Medium, never being placed in RDAP and never knowing why he wasn't.

Though BOP never implemented the Court's recommendation for RDAP placement, he was on track for release and reentry to his Ms. Douglas's residence in Texas. For years while he served his sentence, he dreamed of a life outside of Boston. But as his date for release began to draw near, Mr. Daley learned Ms. Douglas would not allow him to stay with her. She had a new boyfriend and didn't want Kim there. Having no other option, BOP returned Mr. Daley to Boston under the First Step Act. With no viable home plan, he could only stay at the Coolidge House. It was a crushing blow he could not recover from. The environment was filled with temptations for Mr. Daley. He shortly thereafter relapsed, left the RRC, and returned fully to a life being on the street. In the throes of his addiction, in short order he entered that bank in Cambridge with a note demanding money.

During his pretrial incarceration in this case, Mr. Daley sought out a MAT referral. The US Marshal sent him to ACI in Rhode Island for an evaluation. That evaluation found him appropriate for MAT. He now receives methadone at Plymouth.

---

[3] Mr. Daley's father was killed in Texas in 2010. PSR ¶92.

Also during this incarceration, Mr. Daley sought to foster human connections. He reconnected with his sister. He explains that his relationship had been poor as a result of her not being able to trust or rely on him over the years because of his substance use disorder. But they have slowly rebuilt their relationship. Mr. Daley takes great comfort in having made enough progress with their relationship that she will now trust him to have telephone contact with his nephews. Mr. Daley clearly expresses how much it has meant to him, saying it makes him feel more than just and addict and a criminal. It gives him an opportunity to see a value in himself where he otherwise hadn't.

Overwhelmingly, Mr. Daley reflects on his circumstances by expressing how tired he is of his existence – substances, crime, and incarceration. He continues to try to think of strategies that could succeed to end his cycle and sustain recovery – he is hopeful of BOP allowing him to complete RDAP during this incarceration, as there is no obvious bar; he is hopeful to continue in a restorative justice program while incarcerated to come to terms with the harm he has caused; he nurtures relationships with a cousin and friend outside of Boston with the hope of it continuing to relocation in the Midwest or California where they reside and getting meaningful employment.

Mr. Daley noted in his last allocution how alone he was when he appeared before the Court. He appears now with pro-social connections which he feels present in his life in a way he didn't before. He is optimistic still for his future and hopeful to find a simple life in an unfamiliar place upon his release. And he takes to heart how he responded to his poor reentry circumstances should he again find himself with only Boston to return to.

**IV.    Sentencing Guidelines**

There is no legal dispute to the guidelines for Mr. Daley. By virtue of his previous

federal sentence and a still-timely drug conviction that occurred almost 23 years ago, he qualifies as a career offender. But that increase in the guideline is exceptionally harsh in Mr. Daley's case because of the nature of that prior drug conviction and the circumstances of the instant offenses. Consequently, a serious variance or departure would be appropriate here.

The conduct underlying the prior drug conviction at issue dates to May 10, 2002. On that date, Lowell Police observed Mr. Daley interact with a driver, believing they saw Mr. Daley conduct a drug sale. Officers stopped the motor vehicle some blocks away. The driver was in possession of six bags of suspected heroin, and four empty bags. He told police that in the moments after interacting with Mr. Daley, he consumed the drugs in the four empty bags. Six bags still contained drugs. Police arrested Mr. Daley the following day but found no heroin in his residence.

The procedural history of this conviction is nuanced and interrelated with the Middlesex Superior Court Breaking and Entering offense listed in paragraph 64 of the Presentence Report. After his arrest on the drug charge in May 2002, Mr. Daley briefly returned to state prison on a parole violation, but eventually was released pretrial in the summer of 2002 on personal recognizance. The Commonwealth had not indicted the drug case by that time.

In October of 2002, Lowell police arrested Mr. Daley on unrelated new charges of Breaking and Entering and the Middlesex District Attorney charged him as a habitual offender[4]. Just one month prior to that arrest, unbeknownst to Mr. Daley, the

---

[4] This is the offense noted in paragraph 64 of the Presentence Report.

Commonwealth obtained an indictment in his drug case and the Middlesex Clerk mailed a summons for a November arraignment date. Unfortunately, the clerk used the address listed at the time of his drug arrest where he no longer resided. When he did not appear for that scheduled arraignment, the Court issued a warrant.

The Commonwealth obtained an indictment for the Breaking and Entering case, also in November 2002. For some reason neither the prosecutor (who personally had obtained both indictments and would prosecute both cases to conclusion) nor the clerk (both cases were in Middlesex Superior Court) noted the pending default warrant when Mr. Daley appeared out of custody for his arraignment in his Breaking and Entering case in December 2002. Mr. Daley's Breaking and Entering case continued apace, with him regularly appearing out of custody for proceedings – even obtaining a favorable ruling on a motion suppressing statements in the case. He regularly made these appearances but all the while the un-arraigned drug indictment lay dormant. It was actually not until December 2004 – some *2 years* after indictment issued – that the Commonwealth moved to arraign Mr. Daley on the drug indictment.[5]

Mr. Daley resolved his Breaking and Entering charge in July 2005, receiving a 6-year state prison sentence from the court. Though it was also pending at the time and his appearances involved both cases, he did not seek to resolve his drug case at that plea and the case was scheduled for trial. On the eve of a trial setting in March 2006 (8 months after the resolution of the Breaking and Entering charge), Mr. Daley pled guilty in his drug case and accepted a concurrent 5-year state prison sentence. Unbeknownst to Mr.

---

[5] At the time, the Breaking and Entering case was still ongoing and on course for a trial setting after the successful suppression motion.

Daley at his eve-of-trial plea, the motorist from whom police obtained the drugs had died months earlier.

But more important than the procedural aberrations in his drug case is the laboratory analysis recently obtained when undersigned reviewed the history of this conviction[6]. In May 2002, the Hinton lab received 10 items from the Lowell police – 6 full bags and 4 empty bags. The drug receipt noted a *gross weight* of the 6 bags as 1.20 grams:



---

[6] Undersigned counsel initially sought review of the case based on the potential that it had been overlooked as part of the Hinton lab scandal. The lab analysis was completed by an analyst in the months before Annie Dookhan began her employment at the lab and the analysis was not completed by Sonja Farak.

The analysis report would go on to describe the evidence as "6 similar items were received and 1 was randomly selected and analyzed." That analysis showed a *net weight* of controlled substance of 0.01 grams:

```
Howard K.Koh,MD,MPH
   Commissioner
                                        DATE RECEIVED: 05/23/2002
                                        DATE ANALYZED: 07/18/2002

NO. 728382
I hereby certify that the  powder
Contained in 6 plastic packets                 MARKED: 728382
Submitted by DET. BRYAN MCMAHON  of the LOWELL POLICE DEPT.

Has been examined with the following results:
The powder was found to contain:
Heroin, (diacetymorphine) as defined in Chapter 94 C, Controlled
Substance Act, Section 31, Class A.

6 similar items were received and 1 was randomly selected
 and analyzed.
```

GRAND JURY
EXHIBIT
1
9/25/03

```
NET WEIGHT: 0.01 grams (analyzed item only)

DEFENDANT: DALEY, KIM & BOUDREAU, THOMAS


                         ASSISTANT ANALYST
```

In fact, the laboratory bench notes indicate that the weight was barely even one-one hundredth of a gram, it was 0.0136 grams:

```
                     DRUG POWDER ANALYSIS REPORTING FORM

                            Sample Number 728382 Date 07/18/02
                                          DALEY, KIM/BOUDREAU, THOS,

                            Submitting Agency  LOWELL  Analyst
                                              (MCMAHON)
Physical Description
                            Gross weight (before analysis).....= 0.0829
Pow/6 PL PKTS               Weight of powder (before analysis).= 0.0136
(GRoss wts 1.20-Welwt       Weight of container...............= 0.0693
                            Gross weight (after analysis)......=
0)onter wtd PB              Weight of powder (after analysis)..=
                                                                  0.01
Screening
Marquis    (+)      Froehde's  (+)    Meoke's  (+)
Cobalt Thiocyanate  blue qxdes   Dille Koppanyi

Microcrystal Tests

Platinic Chloride_____        Mercuric Iodide    (+)
Gold Chloride  _____          Mercuric Chloride  (+)
TLTA           _____          Other_____

GC/MS
Positive          ✓           Negative     _____
Match Quality  D 071702.5
Other Tests
              (a)
```

12

Because the drug certification describes "6 similar items", it is reasonable to conclude that each weighed a substantially similar amount to the tested sample, meaning the total amount of drugs involved in the case was approximately *1/10th of a gram*.[7]

But for the Career Offender designation, Mr. Daley's advisory guideline range would have been 63-78 months based upon an offense level of 19 and criminal history category of VI. It more than doubles under the Career Offender calculation and is now 151-188. For Mr. Daley, this guideline increase resulting from such a small amount of drugs is exceptionally harsh and warrants a serious departure or variance.

### V.    First Step Act Considerations, Remaining Time Owed, and Anticipated Security Designation

While a defendant ordinarily would be entitled to the award of First Step Act Earned Time Credits (ETC) while serving a sentence under 18 USC §2113(a), because Mr. Daley will be serving a sentence for violating 18 USC §751, he is categorically ineligible for any ETC awards and eligible only for good time credit.

Because the Bureau of Prisons transferred Mr. Daley to an RRC towards the ends of his custodial sentence, it is anticipated that he will additionally serve approximately 6-9 months in custody separately from any sentence the Court imposes here.

Having reviewed Mr. Daley's characteristics in light of the factors that comprise the published Bureau of Prisons designation criteria, it is reasonably believed that Mr. Daley stands to be designated to serve his sentence in a "High" security facility.

---

[7] It should be further noted that the gross weight of the selected item is noted as 0.0829 grams, meaning that the gross weight of six bags weighing a similar amount should be approximately 0.4974, which is substantially different than the 1.20 grams noted at the time the lab received the drugs.

According to a report[8] of the Department of Justice's Bureau of Justice Statistics evaluating the First Step Act ETC, a significant number of prohibited acts of significant severity occur in High security US Penitentiary (USP) facilities which resulted in loss of rewards, incentives or time credits:

**TABLE 6 (continued)**
**Prohibited acts by federal prisoners that resulted in reductions in rewards, incentives, or time credits, by facility, 2022**

| Facility | Total | Low | Moderate | High | Greatest | Facility | Total | Low | Moderate | High | Greatest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sheridan FCI | 905 | 1 | 517 | 148 | 239 | Canaan USP | 1,217 | 0 | 312 | 541 | 364 |
| Talladega FCI | 596 | 0 | 201 | 99 | 296 | Coleman I USP | 1,049 | 1 | 498 | 299 | 251 |
| Terre Haute FCI | 1,191 | 1 | 719 | 291 | 180 | Coleman II USP | 907 | 0 | 425 | 261 | 221 |
| Three Rivers FCI | 891 | 1 | 467 | 158 | 265 | Florence USP - ADX | 163 | 0 | 39 | 20 | 104 |
| Tucson FCI | 96 | 0 | 36 | 50 | 10 | Florence USP - High | 814 | 0 | 506 | 215 | 93 |
| Victorville FCI - Medium I | 793 | 3 | 572 | 132 | 86 | Hazelton USP | 1,249 | 0 | 547 | 358 | 344 |
| Victorville FCI - Medium II | 567 | 1 | 396 | 76 | 94 | Lee USP | 1,322 | 8 | 396 | 516 | 402 |
| Williamsburg FCI | 1,150 | 0 | 552 | 215 | 383 | McCreary USP | 1,434 | 1 | 720 | 417 | 296 |
| Yazoo City FCI - Medium | 390 | 0 | 154 | 33 | 203 | Pollock USP | 1,243 | 0 | 698 | 275 | 270 |
| Yazoo City USP | 598 | 3 | 247 | 83 | 265 | Terre Haute USP | 937 | 0 | 436 | 343 | 158 |
| **High security** | **18,255** | **25** | **7,816** | **6,342** | **4,072** | Thomson Administrative USP | 1,359 | 3 | 416 | 874 | 66 |
| Allenwood USP | 1,070 | 1 | 446 | 467 | 156 | Tucson USP | 1,221 | 3 | 588 | 431 | 199 |
| Atwater USP | 1,150 | 4 | 579 | 341 | 226 | Victorville USP | 1,070 | 4 | 560 | 268 | 238 |
| Beaumont USP | 1,137 | 0 | 419 | 381 | 337 | Yazoo City USP | 60 | 0 | 36 | 4 | 20 |
| Big Sandy USP | 853 | 0 | 195 | 331 | 327 | | | | | | |

Note: This table responds to P.L. 115–391 Section 610, Item 21. Includes prohibited acts by persons in the custody of publicly operated federal correctional facilities in 2022. In 2022, the Federal Bureau of Prisons did not hold any persons in privately operated federal correctional facilities. See *Terms and definitions* for descriptions of prohibited acts by severity level. The facility abbreviations are: ADX—administrative maximum, FCC—federal correctional complex, FCI—federal correctional institution, FDC—federal detention center, FMC—federal medical center, FPC—federal prison camp, FTC—federal transfer center, MCC—metropolitan correctional center, MCFP—medical center for federal prisoners, MDC—metropolitan detention center, and USP—United States penitentiary.

Source: Bureau of Justice Statistics, National Prisoner Statistics, First Step Act Supplement, 2022.

For Mr. Daley – already at risk due to his slight stature – an expected placement in a USP will expose him to dangerous violent offenders and gang members at a time when he becomes ever more vulnerable as he ages.

## VI.    18 U.S.C. § 3553(a) Factors

The Court must impose a sentence which reflects the nature and circumstances of Mr. Daley's offenses and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct.

---

[8] "Federal Prisoner Statistics Collected Under the First Step Act, 2023", United States Department of Justice, Bureau of Justice Statistics, November 2023 at 10, available at: https://bjs.ojp.gov/document/fpscufsa23.pdf (Last accessed February 11, 2025).

738 (2005); <u>United States v. Martin</u>, 520 F.3d 87 (1st Cir. 2008); <u>United States v. Rodriguez</u>, 527 F.3d 221 (1st Cir. 2008). The requested sentence of 78 months in this case is the top of the otherwise applicable advisory guideline, resulting in a lengthy prison sentence which removes him from the community likely into his sixties. It recognizes the critical part his personal background and substance use disorder has played in his offending and provides for required continuation in MAT programming upon his return to the community. It is one which accounts for the factors enumerated under 18 U.S.C. § 3553(a) and is no greater than required to achieve the goals of sentencing.

a. **Nature and Circumstances of the Offense, Seriousness of the Offense, Just Punishment, and Protection of the Public**

Mr. Daley's offenses – commission of a bank robbery after walking away from a halfway house – are categorically and unquestionably serious. But the guidelines do recognize an increasing severity of potential conduct in bank robberies – such as the possession or use of a gun, restraint of the tellers, written or oral threats, commission of a car jacking – which are not present in Mr. Daley's case.[9] Thus, the otherwise applicable guideline adequately accounts for the facts of Mr. Daley's offenses. Clearly, his commission of this robbery offense was a direct result from his return to substances rather than profit through brute violence. The sentence requested here is at the top of the otherwise applicable guideline in part in recognition that due to grouping principles the Escape offense does not impact the guideline itself. A sentence of 78 months of

---

[9] By way of comparison, Mr. Daley's Total Offense Level in his 2016 conviction for commission of 3 bank robberies by way of threatening note was 24 whereas without reference to the career offender guideline, his Total Offense Level in this case would be 19.

incarceration therefore represents a just punishment for these offenses. When paired with Mr. Daley's expected age at release and mandated MAT conditions, no greater term is required in order to reasonably assure protection of the public from further crime.

### b. History and Characteristics of Mr. Daley

Mr. Daley's forearms are tattooed with a succinct description of his background: "Endless" and "Struggle". Born to parents barely old enough to qualify for a driver's license, he endured serious and lasting trauma from an early age. His successive criminal behavior was in service of a place where he could momentarily give himself relief from that trauma and to otherwise stave off withdrawal.

Having endured so much, he expressed clearly to the Court his plan to move to Texas with Ms. Douglas and stay clean after doing programming. The Court recommended Mr. Daley for acceptance into RDAP. BOP did not effectuate that recommendation for reasons which were never explained to Mr. Daley. As his sentence moved towards its completion, Mr. Daley had endured the height of the COVID-19 pandemic behind the walls in Beaumont Medium (where the disease particularly raged), including contracting the disease in December 2020.

In 2021, as BOP planned for his upcoming release date, Mr. Daley received devastating news that his dream of returning to someplace different than Boston was gone. Having initially agreed to let Mr. Daley live with her, Ms. Douglas contacted BOP officials and told them that she would not accept him after all. Mr. Daley would learn that she had begun a new relationship and didn't want him around. With no other option, and without the benefit of RDAP, BOP sent him to an RRC in Boston. Rather than fostering his reentry, his time at Coolidge House included exposure to the temptations of

substances and it was not long before he returned to the familiarity he hoped to insulate himself from.

Mr. Daley recognizes and accepts that he alone is responsible for his criminal conduct here, despite the setbacks he experienced in his release planning. But this nevertheless informs the appropriate balancing of the 3553(a) factors in this case.

During this current incarceration, Mr. Daley has sought to foster other avenues to get out of Boston. Meaningfully, he has worked to repair his relationship with his sister and takes solace in the resulting relationship with his nephews. And he has completed programming during his time at Plymouth[10], most notably an "Inside Out Program" completed in April 2023 through Eastern Nazarene College. While the college remained open, that program connected college students and inmates at Plymouth in college-level course centered on introducing restorative justice principles. He hopes to continue exploring those principles while serving his sentence in this case.

Finally, while incarcerated Mr. Daley sought an evaluation through the US Marshals for his participation in a MAT program as a tool to help him refrain from using substances. That evaluation determined he was appropriate for MAT and he has participated since. He recognizes this as a critical component to relapse prevention for him going forward.

Simply stated, 78 months in a high security US Penitentiary at his age adequately accounts for Mr. Daley's history and characteristics and his current presentation before the Court.

### c. Affording Adequate Deterrence

---

[10] *See* Exhibit A.

Broad deterrence is accomplished by the requested sentence and no greater term is necessary to effectuate this goal. Research suggests that it is the certainty of punishment that serves the greater deterrent effect. *See* United States Department of Justice, Office of Justice Programs, National Institute of Justice "Five Things About Deterrence", May 2016, available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf (Last accessed January 7, 2025)("Research underscores the more significant role that *certainty* plays in deterrence than severity – it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment." (emphasis in original)). Any individual not deterred by 78 months of incarceration resulting from commission of similar offenses is unlikely to be seriously deterred by a greater sentence. No greater period of incarceration is reasonably necessary to satisfy this goal of sentencing.

For Mr. Daley in particular, the close monitoring and swift consequences of a reentry program like CARE would more adequately address personal deterrence rather than more time in custody. Therefore, deterrence of him would be accomplished by entry on the judgment clearly recommending placement of him in any such program in the District where he is released after his sentence. And because he never began his previous period of supervised release, any future violation of supervision could be expected to result in a period of lengthy custody.

### d.  Providing Needed Treatment in Most Effective Manner

Similarly, the sentencing goal of providing treatment in the most effective manner can be accomplished not by a longer period of incarceration but by the strongest possible directive to BOP that Mr. Daley receive RDAP while in custody on this sentence.

### e.  Avoiding Unwarranted Sentencing Disparities

A 78-month sentence would not result in any unwarranted sentencing disparity, even amongst repeat bank robbery defendants. *See* United States v. William Sequeira, 1:22-cr-10352-PBS (D.Mass) ECF No. 37, 40 (54 month sentence adopted for defendant in five-count bank robbery indictment, who previously served 240 months for a spree of armed bank robberies from which he had recently completed supervision); United States v. Akeem Lahens, 1:23-cr-10291-ADB (D.Mass) (71 month sentence for bank robbery for defendant with history of bank robberies); United States v. David Frates, 1:21-cr-10299-RGS (D.Mass) (77 month sentence imposed for bank robbery for defendant with nearly 30 year history of convictions); United States v. Angel Robles, 1:21-cr-10016-WGY (D.Mass) (84 month sentence for defendant with recent prior federal bank robbery conviction where instant case relevant conduct included brandishing and using a firearm in robberies); *and also* United States v. Lawrence Constello, 1:14-cr-10230-NMG (D.Mass) (84 month sentence imposed in armed bank robbery which included a brandishing enhancement and where defendant led police on dangerous high-speed chase after its commission while he was still under a criminal justice sentence and where defendant qualified as Career Offender based on armed bank robbery and armed assault convictions).

The Court can observe that without reference to the Career Offender guideline, the Judiciary Sentencing Information (JSIN) data for defendants sentenced with the same Total Offense Level (19) and Criminal History Category (VI) as Mr. Daley and with a primary guideline of USSG §2B3.1 produces an average sentence length of 57 months and median sentence length of 63 months:



**Average and Median Length of Imprisonment for Defendants in Selected Cell Who Received a Sentence of Imprisonment (excluding §5K1.1)**
Fiscal Year 2019-2023

**Note:** The figure includes the 84 defendants reported to the Commission (1) whose primary guideline was §2B3.1, with a Final Offense Level of 19 and a Criminal History Category of VI, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) the defendant received a sentence of imprisonment in whole or in part. Cases missing information necessary to complete the analysis were excluded from this figure.

*Average and Median Length of Imprisonment* reports the average and median term of imprisonment imposed in months for cases in which a term of imprisonment was imposed. Probation sentences are excluded. Any portion of a sentence that is an alternative confinement as described in USSG §5C1.1 is also excluded. Cases in which a sentence is imposed, but where the length is indeterminable, are excluded. When sentences are expressed as "time served" on the J&C, Commission staff uses the dates in federal custody to determine the length of time served when an defendant has been in and out of custody, or the start date is unclear/missing, then the Commission assigns a value of one day as a minimal time served amount for these cases. In cases where the court imposes a sentence of life imprisonment, sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal defendants given the average age of federal defendants. Sentences of greater than 470 months are also reported as 470 months.

It should also be noted that the JSIN data produced in the presentence report based on an offense level of 29 – which includes average and median sentence lengths below the bottom of the Career Offender guideline – fails to account for whether those defendant's offense level of 29 results from application of a Career Offender designation as opposed to a total offense level that is the product of multiple severe specific offense characteristics or from grouping of multiple counts of bank robbery. This suggests that even if the Court rejects Mr. Daley's contentions about how it should view the Career Offender guideline's harshness under these circumstances, it should still not hesitate to impose a sentence below that Career Offender guideline.

The Sentencing Commission does produce data through its "Interactive Data Analyzer" (IDA) which permits differentiation based on a Career Offender Designation. Those results likewise show that if the Court disagrees with Mr. Daley's argument, a below-career offender guideline sentence remains appropriate. That data shows that since 2017, defendants sentenced using 2B3.1 within this District who were sentenced with a

20

Career Offenders designation received an average sentence length of 116 months, with a median sentence length of 128 months:



Here, both the age of the prior conduct and the extremely small quantity of drug involved in that prior conduct make the Career Offender guideline an inappropriate reference point. The otherwise applicable guideline considers all the circumstances of Mr. Daley's offenses as well as his criminal history. A sentence of 78 months is in line with other sentences imposed and is harsher than the median and average sentence imposed upon defendants with a similar offense level and criminal history being sentenced for bank robbery otherwise. As such, there is no disparity concern present in imposing a sentence of 78 months.

## VII.    Request for Judicial Recommendations

As noted above, Mr. Daley specifically requests that the Judgement reflect the following recommendations from the Court to BOP: (1) that Mr. Daley be housed in a facility which will enable him to enter and complete the RDAP program; (2) that Mr. Daley be afforded access to any reentry programs within the BOP and any specialty

reentry programs or Courts in the District of his release; (3) that Mr. Daley be continued without interruption in a Medication Assisted Treatment Program within the Bureau of Prisons.

**VIII.   Conclusion**

For all these reasons, Mr. Daley respectfully requests that the Court impose a sentence of 78 months of incarceration, to be followed by 3 years of supervised release on terms and conditions suggested in the Presentence Report as well as a special condition requiring Mr. Daley to participate in a Medication Assisted Treatment Program. Additionally, Mr. Daley requests that the Judgment include the above requested judicial recommendations. Such sentence is sufficient, but not greater than necessary here.

Respectfully submitted,

KIM DALEY

By his Attorney,

*/s/ Brendan Kelley*
Brendan Kelley
Assistant Federal Public Defender
51 Sleeper St., 5th Floor
Boston, MA 02210
Tel: 617-223-8061

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the Clerk will be forwarded to Assistant United States Attorney Suzanne Jacobus and the Probation Department on February 12, 2025.

*/s/ Brendan Kelley*
Brendan Kelley